AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

```
LODGED
CLERK, U.S. DISTRICT COURT
11/04/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ASI___ DEPUTY
```

# UNITED STATES DISTRICT COURT

for the Central District of California



```
FILED
CLERK, U.S. DISTRICT COURT
11/04/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___CGM___ DEPUTY
```

United States of America

v.

MYAH OFEIBIA SAAKWA-MANTE,

Defendant.

Case No.  2:24-mj-06694-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about November 2, 2024, in the county of Los Angeles, in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Omar Yasin
_____
Complainant's signature

Omar Yasin -- Special Agent, HSI
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: November 4, 2024

*(Judge's signature)*

City and state:  Los Angeles, California

Hon. A. Joel Richlin, U.S. Magistrate Judge
_____
Printed name and title

AUSA: Lisa Lindhorst (x6772)

**AFFIDAVIT**

I, Omar Yasin, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Myah Ofeibia SAAKWA-MANTE ("SAAKWA-MANTE") for violating 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute Methamphetamine on or about November 2, 2024.

2. This affidavit is also made in support of an application for a warrant to search the following two cellphones (collectively, "SUBJECT DEVICES"), currently in the custody of Homeland Security Investigations ("HSI") in El Segundo, California, each of which are described more fully in attachment A: (1) a white iPhone 12 bearing IMEI number 353342887424967 ("DEVICE-1"); and (ii) a pink iPhone 15 plus with a pink/rose gold case bearing IMEI number 359529826936978("DEVICE-2"), both seized from SAAKWA-MANTE during her arrest.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to possess with the intent to distribute controlled substances), 21 U.S.C. § 953(a) (unlawful exportation of controlled substances), 21 U.S.C. § 960 (knowing exportation of a controlled substance), and 18 U.S.C. § 554 (knowing exportation of any merchandise contrary to any law) (the "Subject Offenses"), as described more

fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   BACKGROUND OF AFFIANT

5. I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been since November of 2022. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. In the course of my work, I have conducted physical surveillance, executed search warrants, and reviewed electronic records.

6. In July 2022, I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. During this training program, I completed approximately 350 hours of instruction,

including classes involving the study of constitutional law, search and seizure, surveillance, contraband investigations, and other program areas for which HSI bears responsibility.

7. During my employment with HSI, I have participated in numerous investigations that involve drug trafficking. Through my training, experience, and interaction with other law enforcement officers, I am familiar with the methods employed by individuals involved in drug trafficking and how they use digital devices to facilitate and conceal their crimes.

### III. **SUMMARY OF PROBABLE CAUSE**

8. A university student from the United Kingdom, SAAKWA-MANTE, was caught on November 2, 2024, at the Los Angeles International Airport ("LAX") attempting to smuggle methamphetamine to Australia. She had the suspected methamphetamine inside her suitcase, which she checked onto her international flight destined for Brisbane, Australia. The suitcase was searched pursuant to border search authority. The methamphetamine was wet and had been caked into approximately 13 white t-shirts that were hidden under the suitcase's internal lining. Officers presumptively tested a sample of the white powder, which yielded positive results for methamphetamine. The total weight of the t-shirts with the methamphetamine caked into them was approximately 13 kilograms.

9. After SAAKWA-MANTE was intercepted at her gate and asked about her suitcase, she admitted to owning the suitcase, she admitted to buying the white t-shirts herself, and she had

the bag tag on her. She also had in her possession the SUBJECT DEVICES.

### IV. STATEMENT OF PROBABLE CAUSE

Based on my involvement in this investigation, my conversations with other law enforcement officials involved in this investigation, and my review of reports and records connected to this investigation, I am aware of the following.

**A.   SAAKWA-MANTE Checks A Suitcase Filled with Suspected Narcotics onto her Flight to Australia**

10.   Customers and Border Protection ("CBP") officers advised me that SAAKWA-MANTE arrived at LAX in the evening on November 2, 2024, and checked one large pink suitcase onto her Quantas Airlines flight. The suitcase was affixed with a bag tag bearing her name.



4

11. After she checked her suitcase, the suitcase was screened pursuant to CBP's international flight screening protocols and border search authority, which is designed in part to curb current narcotics smuggling trends from the United States to Australia.

12. During the initial X-ray screening, the suitcase was flagged for further inspection due to anomalies the screening officers could see on the X-ray images that indicated the potential presence of contraband.

13. Officers pulled the bag for secondary in-person inspection. When they opened up the suitcase, they saw women's clothing and personal items. The officers also noticed a white powder residue that was loose in the suitcase and was visible on their black gloves – it appeared to be coming from beneath the suitcase's lining, which they then unzipped as shown below.

 

14. Beneath the lining of the suitcase, they found multiple white t-shirts that were wet and appeared to be caked with a white powdery substance.



15. After discovering this white powder on their gloves and additional white powdery substance caked into the shirts, officers intercepted SAAKWA-MANTE at her gate as she was trying to board her flight to Australia and brought her to the inspection area with all her personal belongings.

**B. SAAKWA-MANTE Admits to Owning the Pink Suitcase and to Purchasing the White T-shirts that Contained the Suspected Methamphetamine**

16. While at the inspection area, SAAKWA-MANTE confirmed that she owned the pink suitcase. She also had in her possession the bag tag that matched the suitcase, and she signed a declaration affirming her ownership of the bag.

17. When asked about her origin and destination, SAAKWA-MANTE stated she was a university student living and studying in the United Kingdom and was just in the United States for two days. She claimed to be on her way to Australia to meet her boyfriend, whom she had never met in person. When asked about the white t-shirts, she stated that during her two-day stay in Los Angeles, she had gone shopping and purchased the white shirts from a Target using Apple Pay and she confirmed that she has the receipts. When asked about the white powder on the t-shirts, she claimed to have no knowledge of it.

18. Officers then removed all of the t-shirts from beneath the suitcases lining. There were approximately thirteen standard large white t-shirts. The t-shirts were slightly wet and covered in suspected methamphetamine. Due to the moisture, the suspected methamphetamine was caked into the t-shirts and so could not be separated.

 

19. According to the officers that weighed the substance, the combined total weight of the t-shirts with the suspected methamphetamine caked into them amounted to approximately 13 kilograms. Although the officers were unable to separate the methamphetamine from the shirts themselves, I know from my own research that thirteen standard t-shirts would weigh approximately 2 kilograms (5 ounces each). With some variability for the weight of the wetness, I estimate that the methamphetamine alone weighed at least several kilograms.

20. The substance on the t-shirts field-tested positive for methamphetamine. In my training and experience I also know that methamphetamine can appear as a liquid, appear to be in small somewhat clear/translucent crystalized form ("crystal meth" or "rocks") or in a

white powder format. Most commonly, methamphetamine is smuggled into or out of the United States in powder or liquid form. In this instance, I believe SAAKWE-MANTE was actively trying to conceal the methamphetamine within the white t-shirts and had done so shortly before arriving at LAX, as the material was still wet. I believe that the methamphetamine in this case was in two forms – some was in powder form and the rest was a crystalized translucent form and the white t-shirts were used as a means to blend the narcotic with the color fabric of the t-shirt. I believe in this instance the methamphetamine was originally in a powder form and then the powder was "washed" using a solvent and then blended /melded into the t-shirts. Based on my training and experience, I know that over time in a room temperature or cold environment, the solution would evaporate and then the powdered methamphetamine would separate from the shirts.

**C. SAAKWA-MANTE Possessed Both SUBJECT DEVICES**

21. After being escorted to the bag screening area, Officers seized from SAAKWA-MANTE's personal possession both SUBJECT DEVICES. Specifically, she had DEVICE-1 in her hand and DEVICE-2 inside her purse. She admitted both devices were hers. Officers seized the devices, which are currently in HSI's possession.

22. After the above events, agents attempted to interview SAAKWA-MANTE but before doing so read SAAKWA-MANTE her Miranda Rights. She invoked her right to counsel and declined to speak further without a lawyer.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

23. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to

have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

24. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a. Forensic methods may uncover electronic files or been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the

---

[1] As used herein, the term "digital device" includes SUBJECT DEVICES and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

        e.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        f.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        g.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

25. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

26. For all of the reasons described above, I submit that there is probable cause to believe that SAAKWE-MANTE committed a violation of 21 U.S.C. §§ 841(a)(1); Possession with intent to distribute Methamphetamine. I further submit that there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 4th day of
November 2024.

_____
HON. A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE